ISMAIL J. RAMSEY (CABN 189820)
United States Attorney

THOMAS A. COLTHURST (CABN 99493)
Chief, Criminal Division

JARED S. BUSZIN (NYBN 5285838)
Assistant United States Attorney

    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102-3495
    Telephone: (415) 436-7199
    FAX: (415) 436-7234
    Jared.Buszin@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. 22-cr-389-RS |
| Plaintiff, | UNITED STATES' SENTENCING MEMORANDUM |
| v. | Hearing Date: July 25, 2023 |
| LUIS CRUZ, a/k/a "Luis Arias," | Time: 9:30 a.m. |
| Defendant. | |

UNITED STATES' SENTENCING MEMO.
22-cr-389-RS

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................................1

I. THE OFFENSE AND OTHER RELEVANT CONDUCT ............................................................3

    A. The Defendant Sold Fentanyl to an Undercover Officer Multiple Times and Told Him That He Sells Drugs in the Tenderloin Every Night ...........................................3

    B. The Defendant Was Arrested While in Possession of a Significant Amount of Drugs, Including More Than 1.3 Kilograms of Fentanyl, and a Large Knife ....................3

    C. The Defendant Has Made a Career of Selling Narcotics ......................................................4

II. PROCEDURAL HISTORY..........................................................................................................5

III. SENTENCING GUIDELINES CALCULATION .....................................................................5

    A. The Parties and Probation Agree with the Plea Agreement's Guidelines Calculation ............................................................................................................................5

    B. The Defendant Is Not Eligible for Safety Valve ..................................................................6

IV. SENTENCING RECOMMENDATION ....................................................................................9

    A. Legal Standard ......................................................................................................................9

    B. Recommended Sentence and Section 3553(a) Factors ........................................................9

CONCLUSION..................................................................................................................................12

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*United States v. Carty*,
  520 F.3d 984 (9th Cir. 2008) .................................................................................................. 9

*United States v. Cervantes*,
  859 F.3d 1175 (9th Cir. 2017) ............................................................................................. 12

*United States v. Ferryman*,
  444 F.3d 1183 (9th Cir. 2006) .............................................................................................. 6

*United States v. Salazar*,
  61 F.4th 723 (9th Cir. 2023) ................................................................................................. 8

*United States v. Shrestha*,
  86 F.3d 935 (9th Cir. 1996) .................................................................................................. 8

*United States v. Tanner*,
  389 F. Supp. 3d 684 (N.D. Cal. 2019) ............................................................................. 6, 7

**Statutes**

18 U.S.C. § 3553(f) .................................................................................................................. 6, 8

U.S.S.G. § 5C1.2 ......................................................................................................................... 6

**INTRODUCTION**

Defendant Luis Cruz is a drug dealer by trade who has spent the past nine years selling narcotics in the Bay Area and elsewhere in the United States, as reflected by the ten arrests on narcotics-related charges and multiple convictions he has accrued since August 2013.  Most recently, he earned a living by trafficking significant quantities of fentanyl and other narcotics in the Tenderloin, to which he would commute each evening from his residence in Berkeley.  In the course of their investigation, law enforcement purchased fentanyl directly from the defendant on two occasions and methamphetamine from him once.  During the first such purchase, the defendant told the undercover officer that he was in the Tenderloin selling every night in the event the undercover officer liked the narcotics.

On the evening of August 17, 2022, right before he was about to drive from his residence in Berkeley to the Tenderloin, the defendant was detained and a subsequent search of his backpack revealed a huge cache of drugs—including ***more than 1.3 kilograms of fentanyl*** and approximately ***179 grams of methamphetamine***[1]—along with a large knife, as shown below.



---

[1] Unless otherwise noted, all drug weights referred to in this memorandum refer to gross weights.

UNITED STATES' SENTENCING MEMO.          1
22-cr-389-RS

Reflecting the lucrative nature of the defendant's trafficking activity, a search of his residence led to the seizure of approximately $18,000 in U.S. currency, which the defendant has admitted were proceeds from his narcotics sales. The defendant was brazen about his peddling of drugs. Indeed, the conduct giving rise to his federal charges all occurred at a time when the defendant was on probation and GPS monitoring stemming from a 2021 arrest in Oakland on narcotics-related charges.

The activities of the defendant and others who similarly exploit the vulnerabilities of individuals battling substance abuse and addiction issues continue to have a devastating effect on the community. In 2022, there were 647 accidental drug overdose deaths in San Francisco alone, with the large majority of those deaths involving fentanyl.[2] That number has surged in 2023, with the city currently on pace to reach approximately 812 such deaths by year's end.[3] More needs to be done to deter this deadly drug trafficking.

In light of the foregoing and for the reasons set forth below, the government recommends that the Court sentence the defendant to a term of imprisonment of 120 months, to be followed by a four-

---

[2] *See* Yoohyun Jung, *53 People Died in June in San Francisco from Accidental Overdoses*, S.F. Chronicle, https://www.sfchronicle.com/projects/2021/san-francisco-drug-overdoses-map/ (last updated July 14, 2023).

[3] *Id.*

UNITED STATES' SENTENCING MEMO.          2
22-cr-389-RS

year term of supervised release.

## I. THE OFFENSE AND OTHER RELEVANT CONDUCT

### A. The Defendant Sold Fentanyl to an Undercover Officer Multiple Times and Told Him That He Sells Drugs in the Tenderloin Every Night

Law enforcement began investigating the defendant after a confidential informant identified him as a regular seller of various narcotics around the 400 block of Hyde Street in the Tenderloin. On July 19, 2022, an undercover SFPD officer (the "UC") approached the defendant in the vicinity of Eddy Street and Leavenworth Street in the Tenderloin. PSR ¶ 6. The defendant asked the UC what he wanted and the UC responded, "fent," at which point the defendant retrieved approximately 2 grams of a substance that he sold to the UC for $40. *Id.* ¶¶ 6-7. Later testing confirmed the substance contained fentanyl. *Id.* During the controlled purchase, the defendant told the UC that he was at the same location every night if the UC liked the drugs. *Id.*

On July 28, 2022, the UC approached the defendant in the vicinity of Eddy Street and Leavenworth Street and told him that he wanted to buy "40 of fent and 10 of crystal." *Id.* ¶¶ 8-9. The defendant had the UC wait while he retrieved two substances, which later tested positive for fentanyl and methamphetamine, that he sold to the UC for $50. *Id.* The defendant also provided the UC with his phone number to coordinate future drug sales. *Id.* ¶ 10.

Subsequent investigation confirmed the defendant's earlier statement to the UC that he was in the Tenderloin every night selling drugs. Buszin Decl., Ex. A at LC-0000044 - 48. After the July 28 controlled purchase, SFPD officers continued their surveillance of the defendant and also monitored location data associated with his cell phone and the movements of a Lincoln MKZ vehicle that he was observed driving and which was registered in his name. *Id.* Through that investigation, officers learned that the defendant was generally leaving a location in Berkeley every night around 7 p.m. and traveling to the Tenderloin. *Id.* He would generally return to the Berkeley location around 3 a.m. each night. *Id.*

### B. The Defendant Was Arrested While in Possession of a Significant Amount of Drugs, Including More Than 1.3 Kilograms of Fentanyl, and a Large Knife

On August 17, 2022, SFPD officers obtained a warrant authorizing a search of the defendant, his vehicle, and his residence in Berkeley. PSR ¶ 12. That evening, officers observed the defendant exit his

apartment building at 1590 Oregon Street with a black backpack, which he placed in the back driver seat of his car. *Id.* Soon thereafter, officers executed the search warrant and found, among other things, the following contraband in the defendant's backpack: 1.3856 kilograms of fentanyl, 179.2 grams of methamphetamine, 99 grams of heroin, 122.3 grams of cocaine base, and 16.6 grams of cocaine. *Id.* ¶ 13-14. There was also a large knife in the defendant's backpack along with his drugs. *Id.* During a search of the defendant's apartment, officers also found $18,012 in cash in his bedroom, which the defendant has admitted were proceeds from his drug trafficking activity. *Id.* ¶ 15.

### C. The Defendant Has Made a Career of Selling Narcotics

The conduct described above represents only some of the most recent instances in the defendant's long career of selling narcotics, which comprises a number of incidents of increasing seriousness. Indeed, at the time the events underlying this case occurred, the defendant was on probation and electronic monitoring in connection with an April 2022 conviction for drug-related activity. PSR ¶¶ 36, 38; Buszin Decl., Ex. B. That conviction arose from a February 11, 2021, Oakland incident in which law enforcement found approximately 383 grams of cocaine, 114 grams of methamphetamine, 22 grams of heroin, $18,960 in cash, and a rifle in Mr. Cruz's bedroom during the execution of a search warrant. PSR ¶ 36.

On December 16, 2020, the defendant was arrested by California Highway Patrol ("CHP") after a search of his vehicle revealed various containers concealing methamphetamine, heroin, cocaine base, and cocaine along with $2,800 in cash and packaging materials. PSR ¶ 44; Buszin Decl., Ex. C. Echoing the facts of this case, officers also found a large knife concealed in the vehicle that the defendant was using to transport the narcotics. PSR ¶ 44.

The defendant's criminal history reveals a number of other instances where he was observed trafficking various narcotics, both in the Bay Area and in Seattle. PSR ¶¶ 34-35, 40-41, 43, 45-46. It also includes one documented instance of violence, where the defendant's probation was revoked after he was identified as the assailant in a stabbing that took place outside of a San Francisco nightclub. PSR ¶ 42.

## II. PROCEDURAL HISTORY

On October 4, 2022, a federal grand jury returned an indictment charging the defendant with seven violations of 21 U.S.C. § 841(a)(1), (b) for possessing with intent to distribute and/or distributing fentanyl, methamphetamine, heroin, and cocaine base. Dkt. 4. The defendant was ordered detained pending trial on the grounds that he presented both a flight risk and danger to the community. Dkt. 16. On April 18, 2023, the defendant pleaded guilty to Counts Two, Five, and Six of the indictment pursuant to a plea agreement with the government.[4] Dkt. 29, 30. As part of that agreement, the defendant committed to not seek a sentence of less than 72 months' imprisonment if the Court were to determine that he is eligible for safety valve or a sentence of less than 96 months' imprisonment if the Court were to determine that he is not eligible for safety valve. Dkt. 29 ¶ 7. The government, by contrast, agreed to recommend a sentence within the Guidelines range set forth in the plea agreement if the Court were to determine that the defendant is eligible for safety valve, or a sentence of 120 months' imprisonment if the Court were to determine that he is not, so long as the defendant did not violate the agreement or fail to accept responsibility. Dkt. 29 ¶ 16. On June 22, 2023, the defendant participated in a debrief pursuant to 18 U.S.C. § 3553(f)(5) in an effort to pursue safety valve under 18 U.S.C. § 3553(f). Buszin Decl., Ex. D.

## III. SENTENCING GUIDELINES CALCULATION

### A. The Parties and Probation Agree with the Plea Agreement's Guidelines Calculation

The parties and Probation agree that the defendant's base offense level under the Guidelines is 30 pursuant to U.S.S.G. § 2D1.1(a)(5), (c)(5). Dkt. 29 ¶ 7; PSR ¶ 22. This figure is based on the converted drug weight for the fentanyl, methamphetamine, heroin, and cocaine base attributable to the defendant from the two July 2022 controlled buys and the August 17, 2022 search and seizure. The parties and Probation also agree that the defendant's possession of a knife at the time of his arrest warrants a two-point increase to the base offense level pursuant to U.S.S.G. § 2D1.1(b)(1). Dkt. 29 ¶ 7;

---

[4] Count Two charged the defendant with possessing with intent to distribute 50 grams and more of a mixture or substance containing methamphetamine, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(B)(viii). Counts Five and Six charged the defendant with possessing with intent to distribute and distributing fentanyl, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(C).

PSR ¶ 23.  Finally, the parties agree that a three-point decrease to the base offense level is appropriate under U.S.S.G. § 3E1.1 based on the defendant's acceptance of responsibility.  Dkt. 29 ¶ 7; PSR ¶¶ 29-30.

### B.     The Defendant Is Not Eligible for Safety Valve

The defendant has pleaded guilty to Count Two of the indictment, which carries a mandatory-minimum sentence of five years' imprisonment.  The government expects the defendant will argue that the Court can sentence him without regard to that mandatory minimum sentence and that he should be afforded an additional two-point reduction in his Guidelines offense level pursuant to the safety valve provisions set forth in 18 U.S.C. §3553(f) and U.S.S.G. § 5C1.2.  The Court should reject that argument for either of two reasons.

#### 1.     The Defendant Possessed a Dangerous Weapon in Connection with the Offense

A defendant is eligible for safety valve relief only if he "did not use violence or credible threats of violence or possess a firearm or other dangerous weapon (or induce another participant to do so) in connection with the offense."  18 U.S.C. §3553(f)(2).  The defendant shoulders the burden of proving by a preponderance of the evidence that he did not possess a dangerous weapon in connection with the offense.  *See United States v. Ferryman*, 444 F.3d 1183, 1186 (9th Cir. 2006).

The phrase "in connection with" is not defined under either 18 U.S.C. § 3553(f) or the corresponding section of the Sentencing Guidelines.  *Id*; U.S.S.G. § 5C1.2.  To assess whether a dangerous weapon was possessed in connection with an offense within the meaning of these provisions, "courts conduct fact-bound and contextual inquiries, focusing on details like the circumstances in which the [weapons] were found, the implausibility of the defendants' explanations for how the [weapons] were unconnected to the drugs, or the types or quantity of weapons possessed."  *United States v. Tanner*, 389 F. Supp. 3d 684, 686 (N.D. Cal. 2019) (quotation marks omitted); *accord Ferryman*, 444 F.3d at 1186-87.  "Courts have described 'in connection with,' for purposes of safety valve eligibility, as involving a close connection linking the individual defendant, the weapon and the offense." *Tanner*, 389 F. Supp. 3d at 686 (quotation marks omitted).  A defendant may possess a weapon in connection with a drug offense if the weapon is in proximity to drugs *or* if the weapon facilitates the drug offense,

whether by emboldening an actor who had the ability to display or use the weapon, by serving as an integral part of a drug transaction as in a barter situation, by instilling confidence in others who relied on the defendant, or serving as a badge of office to help the defendant avoid detection. *Id.*

Here, the defendant cannot establish that he did not possess a dangerous weapon in connection with the offense. When officers searched the backpack that the defendant was seen placing in his car just before his arrest, they found a long knife along with containers of narcotics, plastic baggies, and a digital scale. The weapon could not have been in closer proximity to the drugs and materials used to facilitate their distribution. Furthermore, the defendant's knife was no pocketknife. The photo above showing the knife alongside the backpack suggests that the weapon was nearly as long as the backpack was high. The size of the knife and its close proximity to the defendant's narcotics indicates that it was likely a tool used by the defendant to intimidate other drug dealers competing for customers in the Tenderloin and/or to protect the defendant and his illicit drugs and drug-trafficking proceeds from theft.

The defendant's explanation for how the knife was unconnected to the drugs is also incredible. During his safety valve debrief, the defendant claimed that he had purchased the knife from a street vendor the day before his arrest and that he had intended to send it to his grandfather. Buszin Decl., Ex. D ¶ 19. The defendant reported that he had put the knife in his backpack when he purchased it, which purportedly did not contain narcotics at the time. *Id.* The defendant then said that he did not realize the knife was still in the backpack when he placed his narcotics in the same bag before heading out for the Tenderloin to sell them the next day. *Id.* This explanation is not only facially implausible but also conflicts with information the defendant provided to Probation in connection with preparation of the PSR.[5] The implausibility of the defendant's explanation is further reinforced by his December 2020 arrest by CHP, where officers found "a large knife, approximately 10-12 inches in length resembling a machete, under the driver seat" of the vehicle the defendant was using to transport various narcotics. PSR ¶ 44. Indeed, the knife recovered by law enforcement in this case appears to bear similarities to the knife described in the 2020 CHP report, which casts further doubt on the defendant's claim that he had purchased the knife the day before his arrest.

---

[5] The defendant told Probation that his grandfather passed away approximately six years ago. PSR ¶ 53.

### 2.    The Defendant Was Not Truthful During His Safety Valve Debrief

A defendant seeking safety valve must also, by the time of sentencing, "*truthfully* provid[] to the Government all information and evidence the defendant has concerning the offense or offenses that were part of the same course of conduct or of a common scheme or plan." 18 U.S.C. §3553(f)(5) (emphasis added). "[T]he fact that the defendant has no relevant or useful other information to provide or that the Government is already aware of the information shall not preclude a determination by the court that the defendant has complied with this requirement." *Id.* This provision amounts to a "tell all you can tell" requirement that obligates a defendant seeking safety valve to disclose "all information at his disposal which is relevant to the offense, whether or not it is relevant or useful to the government's investigation." *United States v. Shrestha*, 86 F.3d 935, 939 (9th Cir. 1996). "The phrase 'all information and evidence' is quite broad. There is no limit placed on the type of information that must be provided." *United States v. Salazar*, 61 F.4th 723, 727 (9th Cir. 2023). Such information may include "details concerning other parties to the crime, such as the source who provided defendant with the drugs and other persons in the chain of distribution, if known." *Id.* The defendant has the initial burden of demonstrating by a preponderance of the evidence that he is eligible for safety valve. *Shrestha*, 86 F.3d at 940. Once he has done so, "it falls to the Government to show that the information he has supplied is untrue or incomplete." *Id.*

In this case, the defendant did not *truthfully* debrief with the government, as required under § 3553(f)(5), thereby rendering him ineligible for safety valve. As an initial matter, the defendant lied during his debrief when asked about his knife and its connection to his drug trafficking activity, as explained above. Beyond that, the defendant made numerous claims that are contradicted by the evidentiary record or otherwise highly implausible. *See* Buszin Decl., Ex. D. For example, the defendant claimed that he did not begin selling drugs until sometime around 2019 notwithstanding numerous arrests and/or convictions for drug trafficking activity before then. PSR ¶¶ 34, 35, 40, 41, 43, 45-46. The defendant also claimed that he did not sell drugs every day,[6] which conflicts with his prior statement to law enforcement that he was "at the same location every night" selling narcotics and cell

---

[6] Buszin Decl., Ex. D ¶ 20; *see also* PSR ¶ 6 n.1.

phone ping and vehicle tracker data obtained prior to the defendant's August 17 arrest. PSR ¶ 6; Buszin Decl., Ex. A at LC-0000044 - 48. Finally, the defendant claimed that it would have taken him a couple months to sell all the fentanyl that was found in his backpack at the time of his arrest. Buszin Decl., Ex. D ¶ 16. The notion that the defendant would bring a cache of drugs that would purportedly take many months to sell with him when traveling to the Tenderloin belies credulity, particularly where doing so would presumably be unnecessary and expose the valuable narcotics to an increased risk of loss via theft or potential law enforcement seizure.

## IV. SENTENCING RECOMMENDATION

### A. Legal Standard

The Court should impose a sentence that is sufficient, but not greater than necessary, to reflect the purposes of sentencing that Congress identified in 18 U.S.C. § 3553(a)(2). *United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008). The Court should begin by calculating the correct sentencing range under the Guidelines. *Id.* After determining the appropriate Guidelines calculation, the Court should then evaluate the sentence for substantive reasonableness in light of the factors set out in § 3553(a). *Id.* at 991-93. The factors that the Court must consider include:

> (1) The nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) The need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (3) The need for the sentence imposed to afford adequate deterrence to criminal conduct;
>
> (4) The need for the sentence imposed to protect the public from further crimes of the defendant;
>
> (5) The need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
>
> (6) The need to provide restitution to any victims of the offense.

### B. Recommended Sentence and Section 3553(a) Factors

Upon consideration of the Guidelines and the factors set forth in 18 U.S.C. § 3553(a), the

government respectfully recommends that the Court sentence the defendant to a 120-month term of imprisonment, which is within the Guidelines range associated with an Adjusted Offense Level of 29 and Criminal History Category III.

The defendant possessed a significant amount of fentanyl, along with other narcotics, at the time of his arrest and the evidence discussed above indicates he was selling large quantities of fentanyl for some time.  This suggests the amount of drugs underlying the charged offenses is merely the tip of the iceberg in terms of what the defendant was trafficking before his arrest.  This is a considerable aggravating circumstance given the havoc that fentanyl is wreaking in the community, a fact that has been widely documented and which is readily evident by walking the streets around the federal building where the Court sits.  The seriousness of the offense and the danger that the defendant poses to the community are evident not only by the quantity and type of drugs he was selling, but also by the fact that he possessed a dangerous weapon while doing so.  As noted above, the defendant's arrest in connection with this case was not the first time that he was arrested while in possession of narcotics and a large knife.  And his connection to a 2017 stabbing incident suggests that the defendant is willing to use his weapons to harm others.

A substantial sentence is also necessary in this case to promote respect for the law and to afford adequate deterrence, both specifically as to the defendant and more generally for the myriad drug traffickers pushing fentanyl in this District every day.  The defendant's conduct demonstrates his utter lack of respect for the law, particularly considering that he continued to sell narcotics after being convicted and/or arrested numerous times for that very activity.  The fact that the defendant was selling fentanyl to the UC in this case only about three months after receiving a favorable plea and sentence in connection with his February 2021 arrest in Oakland is illustrative, as is the fact that he was willing to do so while on court supervision and location monitoring.

The record also suggests that drug trafficking has been quite lucrative for the defendant.  Law enforcement seized approximately $18,000 in illicit proceeds from the defendant in connection with this case.  When he was arrested in connection with the February 2021 Oakland incident, law enforcement seized approximately $19,000 in illicit proceeds that the defendant admitted was his.  And CHP officers

found approximately $2,800 along with the defendant's narcotics when his vehicle was searched in December 2020. In light of the foregoing, the defendant has a strong incentive to continue trafficking narcotics after serving his sentence, just as he has done in the past. While the defendant is subject to deportation after having served his sentence, it is not uncommon for foreign nationals to unlawfully return to the United States after being deported and the profits he was able to reap trafficking drugs here provide him with a reason to do so. Accordingly, a significant sentence is necessary to deter the defendant from future drug trafficking.

The government recognizes that the defendant will be requesting a below-Guidelines sentence and that Probation has recommended a significant downward variance. In support of its recommendation, Probation points to information that the defendant provided regarding his upbringing and his family circumstances. *See* PSR Sentencing Recommendation at 2-3. The government anticipates that the defense will further argue that a downward variance is warranted because the defendant purportedly sold drugs out of necessity and/or fear that not doing so would result in harm to him or his family.

The government does not doubt as a general matter that the defendant has had to overcome a difficult past, as have many individuals who come in contact with the criminal justice system, and the government further acknowledges that there are some foreign nationals engaged in drug trafficking in the United States who legitimately fear reprisals from their suppliers and/or smugglers who facilitate their entry into this country. Having said that, the defendant's claims regarding his background and alleged threats of harm should be viewed with appropriate skepticism. The PSR notes that the defendant was the sole source of information regarding his background and his account is otherwise unverified. PSR ¶ 47. The government is also troubled by apparent inconsistencies in the information the defendant has provided regarding his background in connection with this case. For example, the defendant reported to Probation that his father abandoned his family and that he had not been a part of his life since he was five years old. PSR ¶ 49. When he was interviewed by Pretrial in anticipation of his bail hearing, however, the defendant reported that he maintained weekly contact with his father. Dkt. 8 at 2. There are also apparent inconsistencies with respect to the substance abuse history that was disclosed to

Probation versus the one disclosed to Pretrial. *Compare* PSR ¶ 63, *with* Dkt. 8 at 5. And the defendant has provided shifting accounts about the timing and circumstances of his wife and children's return to Honduras. *Compare* PSR ¶ 55 n.4 (claiming that wife and children fled to Honduras in 2022 out of fear of retribution), *with* Dkt. 31, Probation Response to Objection No. Four to PSR (noting that prior Alameda County probation report indicated defendant's wife and children had returned to Honduras in 2020 because of a family illness and remained there), *with* Dkt. 8 at 3 (noting that defendant reported to Pretrial that his wife resided in Honduras but that his children lived in Berkeley and were on vacation in Honduras). These inconsistencies are all the more troubling when considered in conjunction with the implausible information provided by the defendant in connection with his safety valve debrief. *See* Buszin Decl., Ex. D.

Balancing all these considerations, the government believes a within-Guidelines sentence of 120 months' imprisonment followed by a four-year term of supervised release would be sufficient, but not greater than necessary, to comply with the purposes set forth in 18 U.S.C. § 3553(a). In addition to the standard conditions of supervised release, the government further agrees with the special conditions proposed by Probation, including the expanded search condition the parties agreed upon in the plea agreement. The expanded search condition is warranted given the defendant's significant criminal history, prior violations of criminal supervision, and the risk that he will reoffend. It is necessary to deter the defendant's criminal conduct, allow detection of any criminal conduct he engages in, and to encourage his rehabilitation. *See United States v. Cervantes*, 859 F.3d 1175, 1184 (9th Cir. 2017).

## CONCLUSION

For the foregoing reasons, the government respectfully recommends that the Court impose a sentence of 120 months' imprisonment and four years of supervised release, subject to the standard conditions and other special conditions proposed by Probation. The defendant shall also pay a mandatory special assessment of $300.

| | | |
|---|---|---|
| 1 | DATED:  July 18, 2023 | Respectfully submitted, |
| 2 | | ISMAIL J. RAMSEY |
| 3 | | United States Attorney |

*/s/ Jared Buszin*
JARED S. BUSZIN
Assistant United States Attorney